

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | |
|---|---|
| IN THE INTEREST OF: A.M.W., S.W., R.W., F.W., A.C.W. and G.W.; ) | WD84846 consolidated with WD84850 |
| Juveniles, ) | |
| JUVENILE OFFICER; and ) | OPINION FILED: |
| Respondent, ) | May 31, 2022 |
| DEPARTMENT OF SOCIAL SERVICES, CHILDREN'S DIVISION, ) | |
| Respondent, ) | |
| vs. ) | |
| A.W.; and ) | |
| Appellant, ) | |
| P.G., ) | |
| Appellant. ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable Jalilah Otto, Judge**

**Before Division Four:**
**Cynthia L. Martin, C.J., Anthony Rex Gabbert and Janet Sutton, JJ.**

In these consolidated appeals, P.G. (Mother) and A.W. (Father) appeal a Jackson County Circuit Court, Family Court Division (court), judgment terminating their parental rights to A.M.W., S.W., R.W., F.W., A.C.W., and G.W. (collectively, the

children).[1] The court determined that termination of both Mother and Father's parental rights was appropriate on the basis of abuse or neglect under section 211.447.5(2), failure to rectify under section 211.447.5(3), and parental unfitness under section 211.447.5(5)(a).[2] The court also found that termination of both Mother and Father's parental rights was in the children's best interest. Mother and Father challenge the court's findings of abuse or neglect, failure to rectify, and parental unfitness as against the weight of the evidence. Mother also contends that the court abused its discretion in determining that termination was in the children's best interest. We affirm.

## Factual and Procedural Background[3]

Mother and Father are the natural parents of the children.[4] The family has had a long history with child protective services due to concerns of substance abuse, unsanitary living conditions, and lack of supervision since 2010. When Mother lived in Arkansas in 2011,[5] the family was involved with Children's Services. A.M.W., V.W., and S.W. were removed and placed in foster care due to concerns of substance abuse, and V.W.'s mental health and instability. V.W. was hospitalized at a psychiatric residential treatment facility, he expressed homicidal and suicidal ideations, and he

---

[1]  At the time of the trial, the children were between two and eleven years old.

[2]  Statutory references are to RSMo (2016) as supplemented.

[3]  "When reviewing a judgment terminating parental rights, we view the facts in the light most favorable to the judgment." *In re D.L.S.*, 606 S.W.3d 217, 220 n.1 (Mo. App. W.D. 2020).

[4]  Mother and Father are also the natural parents of V.W. (DOB 1/23/2004), but their parental rights to V.W. were not at issue in this termination case. A case worker testified that, at the time of the trial, the goal for V.W. was Another Planned Permanent Living Arrangement (APPLA) by way of a legal guardianship.

[5]  Father was working in Wyoming.

2

admitted that he attempted to take his then two-year-old sister's diaper off, and said, "I put my weenie in her mouth."

The family moved to Missouri, and in 2014, there was a report of unsanitary living conditions. Children's Division provided services to the family which included a 6-8-week intensive in-home service program to address concerns of unsanitary living conditions. During this program, service providers were in the home for 30-40 hours per week to provide instruction to Mother and Father to remedy the issues that led to Children's Division involvement.

In 2015, shortly after the service program was completed, the Juvenile Officer filed a petition alleging concerns of drug-related abuse and neglect. Mother and Father stipulated to, and the court sustained, allegations in an amended petition in March 2015. Mother admitted that she abused illegal substances such that her ability to parent was impaired, that F.W. and Mother tested positive for marijuana and amphetamine at F.W.'s birth in January 2015, that she used methamphetamine from approximately May 2014 until July 2014, and that she used marijuana daily including during her pregnancy and while parenting. Father admitted that he abused illegal substances such that his ability to parent was impaired, and that he used methamphetamine until approximately January 2015 while having custody of the children. Mother and Father also stipulated V.W., A.M.W., S.W., R.W., and F.W. were without the proper care, custody, and support necessary for their well-being, and that the children were at risk of further harm or neglect.

V.W., A.M.W., S.W., R.W., and F.W. were removed from the home. The family entered Family Drug Court, and Mother and Father were offered services including

3

drug treatment and testing, parenting education, psychological evaluations, individual and family therapy, and family reunion services. During that case, A.M.W. and V.W. were in a behavior program, they received therapy and psychiatric services, and S.W. and R.W. were set up with an early childhood development program. The court released the family from family court jurisdiction in June 2016, and the children reunified with Mother and Father.

In December 2017, the Juvenile Officer filed a petition alleging concerns of drug-related abuse and neglect. Mother and Father stipulated to, and the court sustained, allegations in an amended petition in March 2018. Mother admitted to drug use during her pregnancy, that she gave birth to A.C.W. and G.W. in November 2017, and that at their birth, A.C.W. and G.W. tested positive for substances including methamphetamine, amphetamines and THC/cannabinoids. Father stipulated that he had a history of substance abuse. Mother and Father stipulated that Children's Mercy Hospital had diagnosed G.W. with failure to thrive in December 2017, and they acknowledged that V.W., A.M.W., S.W., R.W., and F.W. were previously under jurisdiction due, in part, to Mother and Father's drug use. Mother and Father stipulated V.W., A.M.W., S.W., R.W., F.W., A.C.W., and G.W., were without the proper care, custody, and support necessary for their well-being and that the children were at risk of further harm or neglect.

The children were placed in Children's Division custody, and the court ordered Children's Division to provide services to the family, including the following: substance abuse treatment and testing, therapy, parenting education, parent aides,

4

psychological evaluations, a behavioral interventionist, a psychiatric evaluation for Mother, and a domestic-violence evaluation for Father.

During the case, Children's Division provided eleven different parent aides to Mother and Father to assist in supervised visits by the children with Mother and Father. The parent aides monitored the visits and paid attention to the parent-child bond, parent-child communication, discipline, child management, and parental attention to the children's physical and emotional needs. At one point, Mother and Father had between 65-80 hours per month of parent-aide services, while the typical number of parent-aide hours was 40. Parenting education was provided as one-on-one time with the parents, as needed for redirection, and before and after visitations for debriefing. Additionally, the parent aides and family-support team used a variety of methods of instruction to assist Mother in basic parenting methods, due to her intellectual disability. A parent aide even called multiple agencies and providers to set up services for Mother, rather than Mother doing so on her own.

In August 2018, V.W. was the first child to return to Mother and Father's home. Next, the family-support team decided that A.C.W. and G.W. would return home on a trial basis, with the intention of reintegrating the rest of the children later. The family-support team and the parents discussed A.M.W.'s fears of being around V.W. and his sexualized behavior. At the end of November 2018, a safety plan was created and implemented in which V.W.'s bedroom was moved farther away from the girls' rooms, age-appropriate rules from MOCSA[6] about appropriate behavior and boundaries were posted, and Mother and Father agreed to supervise all interactions between V.W. and

---

[6] Metropolitan Organization to Counter Sexual Assault.

the children and not leave him alone with them.[7]  However, despite knowing of V.W.'s inappropriate sexualized behavior, and the safety plan in place, Mother and Father left V.W. alone and unsupervised with A.M.W. and S.W.

In December 2018, A.C.W. and G.W. moved back into the family home with Mother, Father, and V.W.  All of the children had an extended overnight visit around Christmas 2018.  In February 2019, A.M.W (and subsequently S.W.) disclosed inappropriate touching by V.W. on an unsupervised visit.  A.M.W disclosed that V.W. had touched her with his hand on top of her clothes on her vagina and her backside. S.W. disclosed that V.W. had shut her in his room and forced her to kiss him on the lips.  A.M.W. and S.W. did not tell Mother and Father for fear of getting in trouble. Mother and Father did not believe A.M.W or S.W., even though the family and team were aware of V.W.'s prior history of inappropriate touching, and Father believed Children's Division was "blowing it out of proportion."

Father blamed A.M.W. for prolonging the case with her disclosure, and whispered to her, "don't you love me?" and "don't you want to come home?" and told her not to tell the team about things that happened during visits because it could get Mother and Father in trouble.

Shortly after the disclosure in February 2019, A.C.W. and G.W. were "safety planned" back to their former foster parent due to concerns that they were not receiving their appropriate medications and doses. Ultimately, A.C.W. and G.W. were not returned to the home because of continued concerns about the lack of supervision and their inability to communicate if something were to happen to them.

---

[7] Mother and Father eventually installed cameras inside the house, but not until after disclosures of V.W.'s sexual touching, which will be discussed below.

6

Beginning in March 2019, Mother and Father were allowed only supervised visitation with the children. However, in December 2019, S.W. and A.M.W.'s visitation with Mother and Father was terminated based on therapeutic recommendations.[8] At the time of the trial, Mother and Father had only limited supervised visitation with R.W., F.W., A.C.W., and G.W.

On January 21, 2020, the Juvenile Officer filed petitions for termination of parental rights, which sought to terminate the parental rights of Mother and Father to the children. An adjudication occurred over four days in September 2020 and October 2020. The court took judicial notice of the previous cases involving Mother and Father and the children,[9] admitted exhibits into evidence, and heard testimony from witnesses, including therapists, psychologists, social workers, parent aides, and Mother and Father.

A parent aide, Lisa Booth, testified of her concerns about the cleanliness of the home, and that she observed bugs on multiple occasions when she was there. Ms.

---

[8] A.M.W. and S.W.'s therapist recommended terminating visitation because the goal had changed from reunification to termination of parental rights, they were having a "really hard time" with transitions, and A.M.W. did not want to go on visits. A.M.W. and S.W.'s current therapist agreed with that recommendation, indicating that A.M.W. and S.W. did not want visitation and that they felt unsafe in their parents' home. The therapist indicated that A.M.W.'s mental health was in jeopardy even discussing her parents. A.M.W. had to be hospitalized after a discussion of her parents came up. A.M.W.'s foster parent confirmed that she seemed to be more "regulated" since visitation ceased and her behavior improved. A.M.W. also told a parent aide that she feels worried when she is with Mother and Father because they do not keep her safe and that V.W "touches [her] in a wrong way" and she is scared to tell Mother and Father because she believes she will get in trouble.

[9] The court took judicial notice of the cases opened in 2015 due to Mother and Father's drug-related abuse and neglect (1516-JU000105 (*In re V.W.*), 1516-JU000107 (*In re A.W.*)*,* 1516-JU000108 (*In re S.W.*), 1516-JU000109 (*In re R.W.*), and 1516-JU000110 (*In re F.W.*)). The court also took judicial notice of the cases opened in 2017 because of Mother and Father's drug-related abuse and neglect (1716-JU001649 (*In re V.W.*), 1716-JU001650 (*In re A.W.*), 1716-JU001652 (*In re S.W.*), 1716-JU001653 (*In re R.W.*), 1716-JU001655 (I*n re F.W.*), 1716-JU001656 (*In re A.C.W.*), and 1716-JU001657 (*In re G.W.*)).

Booth observed stinkbugs and cockroaches crawling on the walls, around the kitchen, and in the dishwasher.[10] Ms. Booth's reports indicated that she "observed the home being unsanitary almost each pop-in [visit] and remaining that way" since she started working with the family.

There were also concerns about Mother and Father appropriately supervising the children.[11] On more than one occasion, Mother and Father were found outside the house smoking while the children remained indoors and unsupervised. F.W. frequently ran out of the parents' sight, and during one visit at the zoo, F.W. ran from Mother and he had to be retrieved by another adult[12] from the woods, again from train tracks, and then he was found running in between cars. Mother was slow to react when this happened.

Parenting aides noted that Mother needed prompting for basic parenting tasks, an issue which persisted throughout the case. A.C.W. and G.W. were not always properly restrained in high chairs, and Mother had to be told to pay attention to G.W. when she was unrestrained to make sure that G.W. did not get hurt. A.C.W. and G.W. were also found with small objects – a small battery or balls and jacks – in their mouths. Mother and Father were observed putting two of the children in the car without car seats, and other children said that they do not have to wear seatbelts in their parents' cars.

---

[10] In her brief, Mother diminishes the unsanitary condition of the house and the amount of times bugs were observed. A review of the record establishes that bugs were a persistent problem in the house. A parent aide noted in her supervised visitation notes that she observed fleas, cockroaches, and stinkbugs in the house during visits in November 2018, December 2018, January 2019, and February 2019.

[11] A lack of supervision has been noted in each case that has been opened in Missouri.

[12] The adult was the foster parent of R.W., F.W., G.W., and A.C.W.

8

There were also concerns that Mother was unable to follow instructions to provide A.C.W. and G.W. their appropriate medication doses. The twins had consistent infections including yeast and ear infections and MRSA. Additionally, A.C.W. and G.W developed severe diaper rash due to their diapers not being timely changed which required medical intervention, and then, due to Mother being either unwilling or unable to apply the correct medication consistently, they developed boils on their buttocks requiring additional medical intervention. The twins were returned to foster care after this occurred.

Parent aides observed that Father expected Mother to parent the children, despite knowing of her limitations and expressing his concern about her ability to parent. Father also expressed to a parent aide that he will continue to physically discipline the children once Children's Division is out of his life, that he believed the rules in place were "stupid," and that he was not going to follow them in the long term.

Mother and Father told parent aides that they were overwhelmed by the prospect of caring for the children. Indeed, many of the children have significant needs. A.M.W. has been diagnosed with attention-deficit/hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), and disruptive mood dysregulation and takes multiple psychiatric medications. A.M.W. has expressed homicidal ideations, has been hospitalized multiple times due to dysregulation, and struggled with increased aggression after unsupervised visits. S.W. has been diagnosed with PTSD. F.W. has been diagnosed with ADHD, an impulse control disorder, a stress disorder, and is on psychiatric medications. V.W. has significant needs – he has severe intellectual deficits, suffers from ADHD, and is fairly nonverbal at 16 years old; he requires

9

psychotropic medications and receives psychiatric services for his behavior including suicidal ideation and sexualized behavior.

A therapist working with A.M.W. and S.W. testified that they required "a lot of services," that she attempted to communicate that to Mother and Father, but she did not believe they had a full understanding of their needs. Father indicated he does not believe the children have special needs.

The court also heard testimony about Mother and Father's psychological evaluations, their mental conditions, and how these conditions affect their parenting, which will be discussed in further detail below.

Ms. Melanie Hicks, a manager of foster care case management, testified that she did not believe there were any other services that would allow for enough change to allow the children to return home in the foreseeable future. The guardian ad litem believed termination to be in the children's best interest.

After the hearing, the court entered findings of fact, conclusions of law and judgment terminating Mother and Father's parental rights to the children on three grounds: abuse or neglect under section 211.447.5(2), failure to rectify under section 211.447.5(3), and parental unfitness under section 211.447.5(5)(a). The court also found that termination of both Mother and Father's parental rights was in the children's best interest and made the statutorily-required findings.

Mother and Father appealed from the judgments and their appeals were consolidated by this Court.

Further factual details will be provided as relevant in the analysis below.

**Standard of Review**

"'Termination of parental rights is an exercise of awesome power, and therefore we review such cases closely.'" *In re D.L.S.*, 606 S.W.3d 217, 222 (Mo. App. W.D. 2020) (quoting *In re A.R.B.,* 586 S.W.3d 846, 856 (Mo. App. W.D. 2019)). Termination of parental rights is allowed when a statutory ground for termination is supported by clear, cogent, and convincing evidence, and when termination is determined to be in the best interest of the child by a preponderance of the evidence. *Id.* In this context, clear, cogent, and convincing evidence instantly tilts the scales in favor of termination when weighed against the opposing evidence and the fact finder is left with the abiding conviction that the evidence is true. *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004).

We review whether clear, cogent, and convincing evidence supports a statutory ground for termination under *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *In re J.P.B.*, 509 S.W.3d 84, 90 (Mo. banc 2017). Thus, we will affirm the trial court's judgment "'unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law.'" *In re D.L.S.,* 606 S.W.3d at 222 (quoting *In re A.R.B.*, 586 S.W.3d at 856). When we review termination of parental rights cases, we are mindful that trial courts are in a better position to determine witness credibility and weigh the evidence in the context of the entire record. *In re J.P.B.*, 509 S.W.3d at 89-90.

When we review questions of fact, this Court recognizes the following:

[T]he circuit court is free to disbelieve any, all, or none of the evidence, and it is not the reviewing appellate court's role to re-evaluate the evidence through its own perspective. The trial court receives deference on factual issues because it is in a better position not only to judge the credibility of the witnesses and the persons directly, but also their

11

sincerity and character and other trial intangibles which may not be completely revealed by the record.

*Id*. at 90 (internal citation omitted).

We view the evidence in the light most favorable to the trial court's judgment, and we disregard all contrary evidence and inferences. *In re D.L.S.*, 606 S.W.3d at 223. We defer to the trial court's assessment of the evidence "[w]hen the evidence poses two reasonable but different inferences." *In re J.P.B.*, 509 S.W.3d at 90.

"'[A] claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment.'" *Ivie v. Smith*, 439 S.W.3d 189, 205-06 (Mo. banc 2014) (quoting *In re J.A.R.*, 426 S.W.3d 624, 630 (Mo. banc 2014)). "In other words, 'weight of the evidence' denotes an appellate test of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact." *Id*. at 206. "The against-the-weight-of-the-evidence standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong." *Id*.

A party challenging a judgment on an against-the-weight-of-the-evidence challenge must follow a four-step analytical sequence:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
(2) identify all of the favorable evidence in the record supporting the existence of that proposition;
(3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,
(4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Houston v. Crider*, 317 S.W.3d 178, 187 (Mo. App. S.D. 2010); *See also In re B.K.F.*, 623 S.W.3d 792, 796-97 (Mo. App. W.D. 2021).[13]

After finding a statutory ground for termination, a court must also consider whether termination is in the best interest of the child, which we review for an abuse of discretion. *In re T.T.G.,* 530 S.W.3d 489, 493 (Mo. banc 2017).

Although the court terminated Mother and Father's parental rights by finding three independent grounds for termination, the existence of just one statutory ground for termination is sufficient if termination is in the children's best interest. *In re P.L.O.*, 131 S.W.3d 782, 789 (Mo. banc 2004).

**Legal Analysis**

Mother and Father both argue the court's findings of abuse or neglect, failure to rectify, and parental unfitness are against the weight of the evidence. Mother also claims the court abused its discretion in finding that termination of her parental rights was in the children's best interest.[14] We first address Mother and Father's points related to the court's termination of their parental rights based on failure to rectify, section 211.447.5(3).

<u>Failure to Rectify 211.447.5(3)</u>

Mother and Father, in their respective points,[15] contend the court erred in terminating their parental rights on the basis of failure to rectify under section

---

[13] Mother and Father both fail to set forth viable against-the-weight-of-the-evidence arguments because they both merely set forth selective evidence contrary to the court's finding while ignoring or diminishing favorable evidence and the trial court's credibility determinations.

[14] Father does not challenge the court's determination that termination of his parental rights was in the children's best interest.

[15] Mother's point three and Father's point two.

211.447.5(3) because the ruling was against the weight of the evidence, and they contend that they adequately rectified the conditions which led to the assumption of jurisdiction.

Section 211.447.5(3) is commonly referred to as "failure to rectify." *In re J.A.R.*, 426 S.W.3d at 625 n.2. A termination based on failure to rectify may be granted when the following elements of section 211.447.5(3) are satisfied: 1) the child has been under the court's care for at least a year; and 2) the conditions which led to the child being taken into care still persist, or "conditions of a potentially harmful nature continue to exist"; and 3) "there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home." Section 211.447.5(3).

In making its determination, the court is required to consider and make findings on the following factors:

> (a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
> (b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
> (c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
> (d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]

Section 211.447.5(3)(a)–(d). "[T]here is no statutory requirement that a factor listed under a ground for termination be proven by clear, cogent and convincing evidence;

14

rather, that burden of proof applies to the ground for termination." *In re J.P.B.*, 509 S.W.3d at 92 (citation omitted). "The factors listed in § 211.447.5(3)(a)–(d) . . . are just that—factors the circuit court must consider." *Id.* "Any one of the factors is a condition or act that may have a negative impact on a child, and if found to exist, should be considered in determining whether grounds for termination exist." *In re S.Y.B.G.*, 443 S.W.3d 56, 60 (Mo. App. E.D. 2014). The court is required to consider and make findings on all four factors, and "the proof of just one is sufficient for termination." *In re D.L.P.*, 638 S.W.3d 82, 89-90 (Mo. App. E.D. 2021). "All grounds for termination must to some extent look to past conduct because the past provides vital clues to present and future conduct." *In re T.T.*, 954 S.W.2d 429, 432 (Mo. App. W.D. 1997).

Here, the court found that the children have been under the jurisdiction of the Family Court for more than one year,[16] that the conditions which led to the assumption of jurisdiction still persist, or that the conditions of a potentially harmful nature continue to exist. The court found that the children came under the Family Court's jurisdiction due to Mother and Father's substance abuse issues, that Mother and Father made significant progress toward remedying those substance abuse issues, but that conditions of a harmful nature continue to exist and there is little likelihood those would be remedied at an early date so that the children could be returned to Mother and Father in the near future. The court found that the children in Mother and Father's care remain at an increased risk of harm or neglect including lack of supervision, sexual abuse, and medical neglect. The court also found that continuation of the parent-child

---

[16] Mother and Father do not contest this.

15

relationship greatly diminishes the children's prospects for early integration into a stable and permanent home. These findings are supported by substantial evidence.

With respect to both Mother and Father, the court considered and made findings on the four statutory factors as required by section 211.447.5(3)(a) - (d). We consider Mother and Father's challenges to specific findings under sections 211.447.5(3)(a), (b), and (c).[17]

Social Service Plan Progress – Section 211.447.5(3)(a)

"[A] parenting, social services, reunification or treatment plan can provide a trial court with highly relevant evidence. A parent's efforts to comply with such a plan will provide the court with an indication of the parent's likely efforts in the future to care for the child." *In re K.A.W.*, 133 S.W.3d at 10. "[A] lack of success despite effort, can predict future problems." *Id.* "Partial compliance with a service plan does not prevent a court from finding grounds for termination as a result of a failure to rectify conduct or conditions." *In re G.G.B.*, 394 S.W.3d 457, 470 (Mo. App. E.D. 2013).

The court found, and the record supports, that Mother and Father, despite years of services, failed to make progress and achieve success with the terms of their social service plan with the Children's Division.

Mother's Social Service Plan Progress

Mother argues that she made "tremendous progress" toward treatment goals, noting that she was able to provide healthy meals, she bonded with the children, attended parent education, and she was making "improvements" in demonstrating

---

[17] The court considered the factor in section 211.447.5(3)(d) and found that Mother and Father do not have chemical dependencies which prevent them from adequately parenting the children.

proper discipline and providing structure and routine. Mother argues that Children's Division has given up on her and that she was set up for failure. We disagree.

Mother was offered multiple services including individual therapy and parenting education, and despite her participation, and the assistance of numerous parent aides, Mother still requires wholly-involved and consistent full-time assistance to adequately parent. The record is replete with Mother's failure to properly or appropriately supervise the children. Despite many hours of parenting instruction and assistance, Mother still left the children unsupervised while she smoked outside. Mother has been unable to protect A.M.W. and S.W. from inappropriate sexual touching from V.W. even with a detailed safety plan in place. Mother failed to properly restrain G.W. in a highchair, the young children were seen with small objects in their mouths (batteries), and Mother was slow to react when F.W. ran away from her in public places near parking lots and on train tracks. The children were observed riding in her car unrestrained.

Mother struggled, at times, to provide clean and sanitary housing, as documented by parent aides, even after she completed an in-home multiple-week program focused on that issue. Mother also had difficulty meeting the children's medical needs. Parent aides testified that Mother struggled to provide the correct medicine to the children, that the children had frequent infections, at one point developed MRSA, and the children in diapers developed boils on their buttocks that required medical intervention. Also, despite Mother engaging in treatment and receiving hours of parenting instruction, some of her parenting inventory scores decreased from 2015, showing again that children in her care would be at greater than average risk of harm or neglect.

17

The court recognized that Mother participated in services and made progress on her substance abuse issues, but she is still unable to consistently and adequately meet the children's needs. Substantial evidence supported the court's finding on this factor.

Father's Social Service Plan Progress

Father argues that he has made progress with the specific treatment goal of therapy, he worked to rectify harmful conditions in the home, and that "more services are needed."[18] We disagree that the Children's Division is obligated to provide more services to Father. Father has already received countless hours of parenting education and supervision while involved with Children's Division off and on since 2014. Although he has received years of services, Father fails to meet the children's needs and is still in need of continued parenting education.

Despite years of parenting education and assistance, Father has "taken a back seat to parenting the children" and relies on Mother to parent, even though he is aware of her limitations and need for help. Father blamed Mother for the reasons the children were in care, and the court agreed with an earlier court commissioner's finding that "[Father's] behaviors and attitudes demonstrate that, in the long term, he will not make the effort required to parent [the] children, especially considering their needs and the [M]other's limitations." Father did not intervene or assist Mother when she struggled to adhere to medical advice and give the children their correct medicine doses.

---

[18] Father also argues that the court's judgment does not identify the terms of the social services plan or which of those specific terms Father violated. We disagree. It is clear from the judgment that Father was expected to fully engage and participate in therapy, parenting education, and drug treatment. As we discuss below, Father continually struggled to satisfactorily engage in individual therapy and make necessary changes to his parenting techniques.

18

Parent aides observed Father outside the house smoking while leaving the children unsupervised and unattended in the home with V.W. Father did this even though there was a safety plan in place to protect the children from V.W. Father does not believe disclosures made by A.M.W. and blames her for the case continuing on. Father failed and refused to consistently participate in recommended therapy, he was discharged unsuccessfully from two providers, and he resisted parenting education. A third therapist was authorized for Father, but Father failed to participate with that therapist.

Father has indicated his desire to return to his prior way of parenting when the case is over, stating that he will continue to physically discipline the children. The children have expressed they distrust Father.

Father also struggled, at times, to provide clean and sanitary housing, as documented by parent aides, even after he completed an in-home multiple-week program focused on that issue. Unsanitary housing has been a problem for the family, with reports of this issue dating back many years.

The court acknowledged Mother and Father's progress and partial compliance with the service plan. Mother and Father's lack of success, despite some effort, can predict future problems. *See In re K.A.W.*, 133 S.W.3d at 10. The family support team stressed the importance of participation in all services to Mother and Father. Additionally, Mother and Father's partial compliance with the service plan did not prevent the court from finding grounds for termination as a result of failure to rectify. *See In re G.G.B.*, 394 S.W.3d at 470.

The court's findings on this factor with respect to both Mother and Father are supported by substantial evidence.

Agency Efforts –Section 211.447.5(3)(b)

"Section 211.447.5(3)(b) requires the trial court to determine whether past services were successful in helping a parent remedy a harmful condition." *In re I.G.P.*, 375 S.W.3d 112, 125 (Mo. App. W.D. 2012).

The court found that despite the efforts of the juvenile officer, Children's Division, and other agencies, Mother and Father have failed to adjust their circumstances and conduct on a continuing basis to  provide a proper home for the children.  This finding was supported by substantial evidence, much of which we have already outlined in our ruling.  Children's Division provided a number of parenting services, including intensive in-home services, family reunion services, parent aides, one-on-one parenting education, parenting classes, a behavioral interventionist, and individual and family therapy.  Family support team meetings, with therapists, parent aides, case workers, and Mother and Father in attendance, were held every 30-60 days over the course of the case to assist Mother and Father's efforts toward reunification. In fact, meetings were held more often in this case than other cases.

Mother and Father appeared to make progress in previous interventions by Children's Division and the court. For example, in 2015, Mother and Father successfully completed intensive in-home services, but shortly after that the children were removed after Mother and Father's drug use was discovered.  In 2016, Mother and Father successfully completed family reunion services and R.W., V.W., A.M.W., S.W., and F.W. were returned home with various community services in place.

20

However, in 2017, the children returned to Children's Division custody for similar concerns. At the end of 2018, Mother and Father received trial home placement of the children, A.C.W. and G.W., but the children were only home for approximately one month before they had to be removed due to concerns of lack of supervision and neglect. Mother and Father are unable to successfully parent the children simultaneously for extended periods of time. The children should not be required to languish in foster care indefinitely.

Mother and Father, despite receiving services from Children's Division for over two-and-a-half years, (and in addition to services received in 2014, 2015, and 2016) have made limited progress toward reunification even after receiving in-depth and one-on-one parenting education. Both Mother and Father's failure to adjust their circumstances and conduct on a continuing basis will likely result in future harm to the children.

The court's findings on this factor with respect to both Mother and Father are supported by substantial evidence.

Mental Condition – Section 211.447.5(3)(c)

The court found that both Mother and Father have documented mental conditions that are permanent or such that there is no reasonable likelihood that the conditions can be reversed, and that the mental conditions render them unable to knowingly provide the necessary care, custody, and control of the children. Substantial evidence supported the court's findings on this issue for both Mother and Father.

Mother's Mental Condition

As required by section 211.447.5.3(c) the court considered and made findings on Mother's mental condition. The court determined the following:

> Competent, compelling evidence showed that [Mother] has a mental condition which is permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders her unable to knowingly provide the necessary care, custody and control of the children.

The court also found that Mother's mental condition presents an ongoing dangerous condition which directly affects her ability to safely parent the children, that it affects her ability to provide minimally acceptable care for the children, and the children would likely suffer harm as a result. The court further noted that Mother's mental condition is permanent such that there is no reasonable likelihood that it can be reversed and which renders Mother unable to knowingly provide the children the necessary care, custody and control, and that Mother is unable to independently and appropriately parent the children.

Substantial evidence supported the court's finding on this factor. Two psychological evaluations documented Mother's mental condition. Dr. Gregory Sisk testified about Mother's psychological evaluations he completed in 2015 and 2018. In March 2015, Dr. Sisk diagnosed Mother with, among other things, mild intellectual disability and persistent depressive disorder (dysthymia), and her overall IQ score was 64. Dr. Sisk's report from Mother's evaluation indicated that people with such diagnoses and IQ "require [more] support and guidance than others to master the demands of daily living," and they "need more support than others under times of emotional or financial stress." Mother also completed parenting inventories that

22

showed children in her care would be at greater than average risk of abuse or neglect based on her beliefs about child rearing.

Mother completed a second psychological evaluation with Dr. Sisk in February 2018. Mother was again diagnosed with, among other things, mild intellectual disability and persistent depressive disorder (dysthmia). Dr. Sisk found that Mother continued to show signs of mild intellectual disability, "which undoubtedly has an adverse effect on all areas of her functioning." When making his diagnosis, Dr. Sisk considered Mother's functioning, information gained from her clinical interview, her participation in special education services, her poor academic skills, her inability to have a career, and her language skills. Dr. Sisk testified that Mother's conditions were not reasonably likely to change in the future and that persistent depressive disorder, is, by definition, persistent. Mother also completed parenting inventories again, with some of her scores decreasing from 2015, and Dr. Sisk noted that her parenting beliefs in 2018 presented more of a risk to her children than they did in 2015.

The court noted the fact that Dr. Sisk's diagnosis remained unchanged from 2015 to 2018 was further support that Mother's mental condition was permanent or unlikely to change in the reasonably foreseeable future.

Mother hired her own psychologist, Dr. Lauren Richerson, to complete an evaluation of her and testify at trial. Dr. Richerson completed her evaluation in August 2020. Dr. Richerson's opinion was that Mother does not meet the diagnostic criteria for intellectual disability, and her opinion was based, in part, on responses to an adaptative behavioral assessment scale in which individuals, picked by Mother, answered questions about her daily functioning. Those individuals were Father's

23

mother, Mother's attorney's investigator, and parent aide Colleen Huff.  Ms. Huff had not seen Mother for approximately a year-and-a-half prior to the assessment.  Notably, Mother did not pick Father, who resided with her, or a current parent aide to participate in the assessment  even though the detailed inventory asked questions about Mother's daily living skills.  Additionally, Susan VanDuesen, Mother's therapist, was treating Mother for major depressive disorder near the time of Dr. Richerson's evaluation, however, Dr. Richerson was unaware of this.  Dr. Richerson acknowledged that major depressive disorder is more severe and enduring than persistent depressive disorder.

The court compared and considered all of Mother's psychological evaluations, including the evaluation completed by Dr. Richerson and offered by Mother at trial.  While Dr. Richerson found Mother did not meet the diagnostic criteria for mild intellectual disability, her opinion was based, in part, on responses to the Adaptative Behavior Assessment System that the court found was completed by individuals with a bias for Mother to do well on her assessment.  The court found Dr. Richerson's opinion unpersuasive.  We defer to the court's assessment of the evidence.  *See In re J.P.B.*, 509 S.W.3d at 90.

Ample evidence showed that Mother's mental condition affected her ability to parent the children safely.  Psychological evaluations, completed by both Dr. Sisk and Dr. Richerson, showed that Mother excelled and struggled with the same types of thinking on both tests; for example, Mother performed well with concrete tasks but struggled with abstract thinking.  The court also acknowledged that Mother did not recognize the safety risks of leaving A.C.W. and G.W. unrestrained in high chairs, that she failed to properly supervise and protect A.M.W. and S.W.  from their brother V.W.'s

24

inappropriate touching, she reacted slowly when F.W. ran out of her sight in public, and she struggled to provide the children with correct medicine doses. As the court correctly noted, multiple children are prescribed a number of psychiatric medications, and Mother's inability or failure to properly follow medication dosages is extremely dangerous to the children.

All of these are examples of how the severity of Mother's mental condition affects her ability to parent the children and how the children would suffer harm as a result.

Substantial evidence supported the court's finding on this factor.

Father's Mental Condition

As required by section 211.447.5(3)(c), the court considered and made findings on Father's mental condition as follows: "Competent evidence showed that the [Father] has a mental condition which is permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders him unable to knowingly provide the necessary care, custody and control of the children." The court also found that Father's mental condition presents an ongoing dangerous condition that directly affects his ability to safely parent the children and to provide minimally acceptable care for the children, and that the children would likely suffer harm as a result. The court further noted, "[F]ather's mental condition is permanent such that there is no reasonable likelihood that it can be reversed and which renders the [F]ather unable to knowingly provide the children the necessary care, custody and control," and that Father is unable to independently and appropriately parent the children. Substantial evidence supported the court's finding on this factor.

25

Father completed psychological evaluations with Dr. Fisk in February 2015 and June 2018 in which he was diagnosed with antisocial personality disorder (ASPD). Dr. Fisk testified that people with ASPD have a long-standing pattern of maladaptive behaviors making the condition unlikely to change in the reasonably foreseeable future, and that the condition would require long-term individual therapy.

Father was ordered to participate in multiple services including individual therapy and parent aide services. From December 2017 to June 2018, Father did not participate in individual therapy. Father participated in therapy with Katie McCurter from June 2018 to approximately October 2018. Ms. McCurter testified that Father displayed very low emotional intelligence, that he was angry during therapy, and that Father blamed Mother for the family's involvement with Children's Division. Father told Ms. McCurter that he had a volatile relationship with Mother, including acts of verbal and physical abuse, some of which occurred in front of the children. Father acknowledged to Ms. McCurter, on multiple occasions, that he did not trust Mother to care for the children, and also that he felt Mother was incapable of caring for the children if left alone with them. Father was discharged unsuccessfully from therapy with Ms. McCurter around October 2018 due to multiple failures to appear for appointments.

In July 2018, Father began therapy with Paul Rosebrough. Father indicated to Mr. Rosebrough that he was only attending sessions to satisfy Children's Division. Although Father made some progress in therapy with Mr. Rosebrough, he last participated in services in December 2019 and was discharged unsuccessfully from treatment.

The court heard evidence on how Father's mental condition affected his parenting. Dr. Sisk testified that it would not be unusual for people with ASPD to have trouble following rules or resisting parenting education. The court found, and the record supports, that Father struggled with both things.

Parent aid reports and testimony from Ms. Booth demonstrated Father's resistance to parenting education, and Father himself said that he would return to his prior way of parenting when the state "left his life," and that he would discipline the children by "beating" them.

There was also evidence of Father breaking rules that put the children at risk of harm. Father drove with a suspended license with some of the children unrestrained in the car. Additionally, he told A.M.W. that when she tells other adults about what happens in their home he gets in trouble. Father's failure to follow rules negatively impacted A.M.W., which made her feel unsafe and dysregulated. Dysregulation for A.M.W. manifested as animalistic behaviors, anxiety, and hyper-vigilance.

Dr. Sisk also testified that Father appeared guarded and unlikely to change his behaviors as he lacked an understanding of his responsibility for the children. Dr. Sisk recommended therapy, and the court required it, but the Father was unwilling to engage in long-term therapy. As the court noted, the underlying cases had been open for two-and-a-half years and Father never successfully completed individual therapy.

Father relies on the testimony of the family therapist, Jim Frentrop, to support his contention that he is able to appropriately parent the children. However, Mr. Frentrop admitted that he was only in the home for a limited amount of time each week. This was far less than some of the assigned parent aides who were in the home roughly

27

sixty hours a month. The court chose to give more weight to the testimony and records of the other parent aides over Mr. Frentrop's testimony, and we defer to this finding. *See In re J.P.B.*, 509 S.W.3d at 90; *In re A.C.G.,* 499 S.W.3d 340, 344 (Mo. App. W.D. 2016).

The court also found Father's testimony at trial with respect to his accountability to be self-serving and at odds with his actions and statements to professionals and family support team members up until the time of trial. We defer to this credibility determination. *In re J.P.B.*, 509 S.W.3d at 90; *In re A.C.G.,* 499 S.W.3d at 344.

Mother and Father cite *In re L.J.D.*, 352 S.W.3d 658 (Mo. App. E.D. 2011), a case in which the court on appeal found the evidence was insufficient to support the circuit court's determination that the mother had a mental condition that rendered her unable to provide the child the necessary care, custody, and control, to support their positions that termination was improper.

In *L.J.D.*, the court found the record lacked (1) substantial evidence establishing the requisite causal connection between a parent's disability and any harm to the child; (2) substantial evidence that the parent's disability rendered her actually unable to care for the child; and (3) substantial evidence that the parent was unable to properly administer her own or the child's medications. 352 S.W.3d at 666.

Unlike in *L.J.D.*, however, the record in this case contains substantial evidence that Mother and Father's mental conditions pose a serious safety risk to the children and renders them unable to adequately care for the children now or in the reasonably foreseeable future.

Mother and Father fail to consider our standard of review and spend considerable portions of their briefs reciting evidence and purported inferences favorable to their positions. However, the clear, cogent, and convincing standard of proof may be met although the juvenile court has contrary evidence before it, and the presence of evidence in the record which might have supported a different conclusion does not necessarily demonstrate that the juvenile court's determination is against the weight of the evidence. *See In re L.N.D.,* 219 S.W.3d 820, 825 (Mo. App. S.D. 2007). Mother and Father have failed to establish that the court's determination was against the weight of the evidence.

Some of the children have been involved with child welfare agencies off and on since 2010. Mother and Father have been offered years of services including multiple intensive in-home programs since 2010. The court's findings under subsections (a), (b), and (c) of section 211.447.5(3) are supported by substantial evidence. The court did not err in finding clear, cogent, and convincing evidence to support termination of Mother and Father's parental rights on the basis of failure to rectify under section 211.447.5(3). Mother's point three is denied. Father's point two is denied.

Because we find that the court did not err in terminating Mother and Father's parental rights on the basis of failure to rectify under section 211.447.5(3), we need not consider whether termination was appropriate on the other grounds found by the court. *See In re A.C.G.,* 499 S.W.3d at 347. Accordingly, we do not consider Mother and Father's remaining points[19] related to termination on those grounds.

---

[19] Mother's points one and two and Father's points one and three.

## Best Interest of the Children

In Mother's fourth point, she asserts that the court abused its discretion in finding that termination of Mother's parental rights to the children was in the children's best interest, that the ruling was against the weight of the evidence, and that it violated Mother's right to due process.

"If it appears by clear, cogent, and convincing evidence that a statutory ground for termination exists under section 211.447.5, then we review the trial court's determination that termination is in the best interests of the children for abuse of discretion." *In re A.C.G.,* 499 S.W.3d at 349. "A trial court abuses its discretion when a ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *In re J.P.B.,* 509 S.W.3d at 96 (citation omitted). "[A] finding that termination is in the child's best interest is a subjective assessment based on the totality of the circumstances." *In re A.C.G.,* 499 S.W.3d at 349 (citation omitted). "We defer to the trial court's factual findings and credibility determinations and do not reweigh the evidence." *Id*. After the trial court has identified a statutory basis for terminating parental rights, section 211.447.6 states that the court must find that terminating the parent's rights is in the best interest of the child. In making that decision, the court must evaluate and make findings on the following seven factors:

> (1) The emotional ties to the birth parent;
> (2) The extent to which the parent has maintained regular visitation or other contact with the child;
> (3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

(5) The parent's disinterest in or lack of commitment to the child;

(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;

(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.

Section 211.447.7. "'There is no requirement, statutory or otherwise, that all seven of these factors must be negated before termination can take place; likewise, there is no minimum number of negative factors necessary for termination.'" *In re B.J.H.*, 356 S.W.3d 816, 834 (Mo. App. W.D. 2012) (quoting *In re C.A.M.*, 282 S.W.3d 398, 409 (Mo. App. S.D. 2009)).

Here, the court made the following findings on the best interests of the children:

a. Although [A.C.W.] and [G.W.] have spent all but a few months of their lives placed outside of the parent[s'] home, the Court finds that the younger four children do have an emotional bond with the parents. While [A.M.W.] and [S.W.] also have a bond with their parents, they have expressed concerns about the parents keeping them safe. They have also expressed that they . . . do not want to return to the parent[s'] home or have contact with their parents. The Court finds that the continuing existence of the dangerous conditions outlined in the above paragraphs greatly outweigh the potential harm of severing the bond that exists between the parents and the children.

b. Since the children were brought into custody of Children's Division, the parents have maintained consistent contact with the children.

c. It is unclear from the evidence adduced how much support, financial or otherwise, the parents provided the children. The Court does find that the parents provided food for the children during visits.

d. Additional services would not be likely to bring about lasting parental adjustment enabling a return of the children to [Mother or Father], within an ascertainable period of time. The parents have received services, for over two and a half years. Prior to this time in care, the family received services in 2014 and 2015. There is no service that has

31

not already been recommended and provided that would enable the parents to successfully reunify with the children in the next sixty to ninety days.

e. The parents have shown an interest in and commitment to the children; however, after receiving services for years the parents remain unable to safely parent the children. The father has also failed or refused to consistently participate in individual therapy or address the concerns regarding domestic violence in the home.

f. There was no evidence adduced that either the mother or the father is currently incarcerated.

g. There was no evidence presented that the parents committed any deliberate acts, or knew or should have known of any deliberate acts of another, which subjected the children to a substantial risk of physical or mental harm.

The court fully considered the best interest factors, and the record, as set forth in detail in the court's judgment as well as discussed above in our decision, amply supports these findings. Mother argues that the court improperly held the "passage of time" against her, and that the court gave no consideration to the "strong bond, commitment, or support shown by Mother." We disagree. Mother ignores much of the testimony and evidence favorable to the court's findings and conclusions, and recites evidence and purported inferences favorable to her position.

These cases have been open since December 2017. The children born prior to 2017 had been placed in protective custody in previous cases. Despite receiving years of services, Mother and Father remain unable to safely parent the children and the children remain at an increased risk of harm or neglect including lack of supervision, sexual abuse, and medical neglect. The children require and deserve a permanent home and security, and that is in their best interest. The court did not abuse its discretion in finding that termination of Mother's parental rights was in the children's best interest. Mother's point four is denied.

## Conclusion

The trial court's judgment is affirmed.

_____
Janet Sutton, Judge

Martin, C.J. and Gabbert, J. concur.